22-1355, Estate of Allan George v. Ryan. Counsel, please proceed. Good morning, and may it please the court. My name is Eric Zaporin, and I am here on behalf of Sergeant Dewey Ryan, former Chief of Police Tommy Kline, and the City of Wrightville. I am here today to respectfully request that the court reverse the district court's denial of qualified and sovereign immunity as to Dewey Ryan, to respectfully request that the court reverse the denial of qualified immunity as to Chief Kline, and should this court find that there is no underlying constitutional violation by either Sergeant Ryan or Chief Kline, we request that the court exercise pendant jurisdiction and dismiss the claims as well against the City of Wrightville. I'm sure the court hears this all the time, but this is undoubtedly a difficult case. It's a tragic case. And in our view, a case with a unique fact pattern, which in and of itself makes the analysis of qualified immunity that much more important. Counsel, I would like to make a request of you at the outset. When you're describing your arguments concerning the facts in this case, we're very constrained in our standard of review. And so I had the impression in your briefs that there are some facts that you were asking us to revisit, which we couldn't, can do. There's some exceptions to our constrained view of abstract issues of law and so forth. And I wanted you to, hopefully in your presentation, be specific about those. I'll address that right now, Your Honor. I don't believe that we have in fact challenged any of the fact findings from the district court, with perhaps one exception. The parties conceded at the district court level that the facts here are not in dispute. The district court, in rendering its opinion, determined as well that the facts are not in dispute. On appeal, it's been raised by the appellees that we are in fact challenging facts on appeal, that challenging the findings of the district court. Perhaps there's one example where we may have done that. And we're able to do that when the facts are contradicted by the record, directly contradicted, blatantly contradicted by the record. In this case, the video, which, of course, I'm sure the courts have seen. And in the district court's ruling, there was a representation as a fact finding that there was no warning that was made to Mr. George before he ran. There was no warning to him to stop. And so, a careful review of the video will show in the moment that he did decide to then turn and run. Officers were yelling his name to don't do it. And Shelby Beitzel, the officer that was also on scene, directly and specifically told Mr. George on three occasions to stop. So is the issue that the warning that the district court thought lacking was stop or I'll shoot? That was not said. It was just drop the weapon. The court made a finding that there was no officer told Mr. George to stop before lethal force was used. And we merely pointed out that that fact finding by the district court is blatantly contradicted by the record. We're also accused of challenging the district court's conclusion that only a reasonable officer could have determined that Mr. George was suicidal and not homicidal and respectfully to the district court. We don't view that to be a fact. That's the officers. The issue is whether the officer had a reasonable belief that not only was Mr. George suicidal, but do the facts that are undisputed that were not challenging with those suggest a reasonable belief on the part of Sergeant Ryan that in fact, in addition to being suicidal, Mr. George was also potentially homicidal when he decided to run. We recognize there are some difficult facts in this case that way against us. And I'm sure Mr. Lane will be emphasizing those to you when he has an opportunity to speak. We recognize that Mr. George never once pointed that gun at any of the officers or anybody else but himself. We can see and it's undisputed that when Mr. George made the decision to run from the officers, he never once made a furtive movement toward his pocket to grab the gun. But those facts, your honor, as undisputed go to a single factor in this case. There's six factors in this case. There's the three factors under Graham versus Connor, and there's the four factors under a state of Larson versus Muir. And the second state of Larson factor is the hostile motion. And we don't dispute that Mr. George at no point made a hostile motion towards that gun as he was running away from the offices. But if the rule of law was that a police officer cannot use lethal force unless a hostile motion was made toward a weapon, then that would render the remaining Graham factors and Larson factors superfluous. That would be the only factor that these courts would need to consider. And what is undisputed here is that two of the three Graham factors weigh in favor of the decision to use force. And in fact, there's been no argument, either at the district court level or at this level, by the appellees that factors one and three under Graham, the severity of the crime, or the fact that Mr. George was resisting attempting to escape, weighs in their favor. So we just ask this court to consider the limited scope of those facts that pertain simply to the idea of no hostile motion, that if the court's going to make the decision simply on those facts alone, the rest of the factors- As part of this, you have to be relying on danger posed to the officers and to the general public. Could you discuss that? Sure. I mean, the second Graham factor talks about the immediate threat, and undoubtedly we recognize that's the single most important factor. The Larson factors are then subsumed within that second Graham factor. And so the threat here that was posed starts well before the officers make contact with Mr. George on August 5th, 2019. Sergeant Ryan knows that he is aware that he's being investigated, not once now, but second time for possession of child pornography. Sergeant Ryan knows before the contact that Mr. George has purchased a firearm in response to being made aware that he's being investigated. Sergeant Ryan is made aware that he's purchased ammunition for that gun. Sergeant Ryan is aware that Mr. George is always in possession of that gun per Mr. George's wife. Sergeant Ryan is informed through an officer who spoke directly to Mr. George's wife, two very important statements. Mr. George saying, I'm not going back to jail and I'm not going down without a fight. And the other side is sort of maybe attempted to mitigate those words by saying, well, sometimes people say that and they don't mean it. These officers needed to believe that to be true. And the wife knew that? She had heard those comments from her husband. Yes, she had relayed those to Officer Ryan. She had relayed those in the earlier maybe a week prior to other investigators, but the very day of the event officers from the rifle police department went over to execute the arrest warrant. Mr. George was not there. They spoke to Mrs. George who then relayed that additional information again. So then what happens when they get on scene? In terms of answering the question about threat level, they conduct a high-risk felony stop in and of itself connotes that this is a high-risk situation requiring the two officers to draw their firearms, position themselves behind the doors of their vehicles and give commands. Typically what happens then is the subject gets shows their hands out the window, gets out of the vehicle, turns around and walks backwards towards the officers. What does Mr. George do? He ignores commands to show his hands. He immediately gets out of the vehicle and with two officers pointing firearms at him, he approaches them and then what does he do? He pulls a firearm out of his waistband. Perhaps the most threatening thing he could possibly do. Arguably the officers would have been justified in using deadly force in that moment and they did. They showed restraint. They wanted to end this case. He didn't point the gun toward the officers, right? He did not, Your Honor. He removed the gun from his waistband and immediately moved it to his chest as he walked to the guardrail over the river. Counsel, help me with this finding that the district court made and I know we don't have a written order in this case, but we do have the transcript. The court says he never threatened an officer or anyone else. What do we do with that finding given the constraints of our appellate review? Well, I think that, again, is that a legal conclusion or a fact finding? Good question. I think it's a legal conclusion. I think the court can look at those undisputed facts that are in the record to determine on its own whether or not there was a threat under a de novo review and reviewing the qualified immunity evaluation here. Back to the threat. What happens next after he pulls that gun is for nine minutes long, he's given over 40 commands to drop the weapon and refuses to do that, despite dropping other personal items that he has on his person. And what would a reasonable officer conclude from that, not from those nine minutes? This is someone who is refusing to drop the gun. Why? Is it reasonable for that officer to assume that they might use it? Maybe they're going to use it against themselves, or maybe they're going to turn quickly in a split second to turn that weapon on an officer, or maybe they're going to turn that weapon on one of the multitude of vehicles that are driving by. It was reasonable to assume that the threat at that point was even further enhanced. Counsel, if we disagree with you that the threat finding in Judge Sweeney's order here is a factual finding to which we have to defer or to accept as true for purposes of our limited review in this appeal, which you can see that there's a constitutional violation. For Officer Ryan. If you are bound by that as a fact, and again, I'll represent, I believe it's a legal conclusion. I understand your argument. But if you're bound by that fact, you are then, I think that would concede factor two under Graham that there's no immediate threat. And then you have to balance that factor two as to the other two Graham factors, which are admittedly in favor of Sergeant Ryan's use of deadly force and not even been challenged at any point by the other side. Well, the district court did not provide any discussion or factual basis underlying Graham factors one and two, did she? I would agree, Your Honor. None whatsoever. Nor did the district court assess two of the four Larson factors, the distance and the fact that there were commands that were given. That was one of the many infirmities with regard to the decision made by the district court. And wasn't there also a finding made that he didn't have a gun? No, there was no finding along those lines, Your Honor. It was simply that he had the gun but made no movement toward the gun, never pointed the gun at the officers, which again, we don't dispute. The court says that he was unarmed, but I think that was a misstep. I think that was a misstep. I think the record's clear that that was. So then getting back to the threat, this all then changes once he decides to run. If Mr. George doesn't, if he drops the gun, we're done. If he stands still, we're done. But once the decision is made now to run, again, what is a reasonable officer to conclude from that? That this is someone who's trying to get away and find an opportunity to use that weapon. Again, maybe against themselves, but maybe against somebody else. And so the threat even was further enhanced at that moment that Mr. George decided to run. Is that true, even though the district court concluded and we must accept that he never would have made it anywhere? Well, again, I think that's a legal conclusion. I think the court can look at. I mean, we have some, so I'm sorry, sorry to interrupt you, but we do have law on this sort of, you can't recast facts as legal conclusions in order to kind of pierce the veil of our limited review. To get into the abstract legal questions. And it seems to me that that's what you're doing. Well, let me attack that question from a different angle then. Whether or not he could have made it to town doesn't then address the issue of whether or not he still could have harmed those civilians that were passing by immediately. And we've argued that there's still that risk to those civilians that are right there driving by. You can hear him in the video. Countless cars keep going by while this is happening. Did the district court conclude as to that, that it was reckless on behalf of the officers not to stop traffic? The district court made the decision that in her mind,  because they didn't close down the roadway. And my argument to that is factually, I think the record would suggest they didn't have the manpower to do that. In fact, they had three officers there at one point and one had to leave. And then more importantly, from a legal perspective, the subjective idea of whether or not the officers believe there to be that, that they needed to do that is not relevant to the objective reasonableness assessment that the court needs to make. What do you think is the applicable, clearly established law element here? But what is, what either is it or what's missing for purposes of Officer Ryan? I'm glad we got there because that was going to be the focus of my argument here, because I think that really was the biggest, the largest infirmity of the district court's decision. We have no, we have no clearly established law. We have four cases cited by the district court that were also cited by the appellees, two of which are out of circuit, one of which was decided after our event. And one, two of the four involving the use of a knife, not a, not a firearm. And at no time did the district court or the appellees meet their very stringent burden that this court has heard from the U.S. Supreme Court countless times, most notably in City of Toleco v. Bond. We need a sufficiently analogous case that would have told Sergeant Ryan in that moment that he decided to use force, that it was beyond debate that his decision to pull that trigger violated the Constitution. But if we're entering the clearly established law analysis with the same deference to the plaintiff's understanding of the facts, and here even more so to the district court's understanding of the facts which favor the plaintiff, we need to assume that there was no threat to the officers who used force here. Is that, is that a fair understanding? I don't think it is, Your Honor. Again, I don't think a decision, whether or not there was an immediate threat, is a legal decision that needs to be based, made based upon the facts of the case. And so a jury, for instance, would have to make that determination at trial from a legal perspective based on the facts. So we would represent the fact that the judge made, the district court made a ruling that there was no threat. I don't even know if they made that ruling that there was no threat. It was just that there's subjectively the officers didn't think that there was a threat. It's dispositive for this court's ruling in making that determination. Thank you for your time. Good morning. May it please the court. My name is David Lane for the plaintiff. I think, Judge Rossman, you are hitting it right on the head. Maybe, maybe, maybe, maybe he was going to be a threat. Maybe he was going to massacre everybody in the town of Rifle. Maybe he was going to turn, pull his gun and shoot it out with the cops. Maybe is not the standard. But did he ever drop the weapon? No, he never did. And is that a threat then? Yes. You want to give him the first shot? No, I mean, we have to look at the facts of this case. Yes, it is possible. He could have turned that gun and started firing at the officers. But the gram factors say it is the immediate threat that must be looked at. And does that mean that he's got to be pulling the trigger? No, you don't have to wait for the glint of cold steel as the court has held. If you perceive an actual threat. Now, there is case law that has been cited by the lower court where suicidal people with guns get killed by the police. And qualified immunity has been denied under those circumstances. But those cases are not applicable to our factual situation. Well, they're out of circuit, but they are applicable to this situation. Well, the suicidal cases where officers rush to the car, where an individual is sitting in the car or standing in the driveway with a knife. How does that even begin to apply to this factual situation? Well, actually, I think you're referring to, I think this court participated in Allen v. Muscogee. Judge Kelly and Judge Briscoe were both on that panel. A man fires shots at the police and police shoot back and kill him. And it's still remanded for factual disputes, leading to a jury trial. It seems like that case turned on the officers putting themselves in a reckless environment to compel that situation. It really seems distinct.  You know, I mean, the issue here is what is the clearly established law in this circuit that gives a roadmap to these officers under these circumstances? And counsel is kind of making it sound like, well, each gram factor adds up. Each gets one point per factor. And the Larson subfactor is each one. And then the grand total wins. And I will concede that the officers under the gram factors, the severity of the crime, it was a felony, albeit a nonviolent felony. And I understand that versus K-9 unit says any felony, you win that gram factor. I agree with that. Two, which is the most important gram factor, I'll get back to that. And three, whether he is actively resisting by fleeing or disobeying orders. Yes, he was. So two out of those three gram factors go to the defendant. But the most important one, according to Garner versus Tennessee and all case law decided by this court and every appellate court in the country, is whether the suspect poses an immediate threat to the safety of the officers or others. Maybe— What does that mean, an immediate threat to the officers or others? Now, does that mean that if he runs down the street with a gun in his hand, that that's not an immediate threat because he's not pointing it at somebody? I would say that it has to be looked at from a reasonable officer's perspective. And so if he's got a gun and he won't do what you ask him and they give him 42 times the opportunity, that that's not reasonable. The gun was pointed at his own chest the entire time. I mean, in fact— Well, as he was running down the road, they were asking, stop, stop. And he wasn't stopping. I agree. So what he was doing is escaping, trying to escape. But he was doing it with a gun in his pocket. In a safe way. Well, none of this is safe. But the issue is, I mean— Is the threat a fact question or a law question? I mean, it's certainly part of the analysis that we look at in the gram factors. But when the district court, in her recitation of the facts here, says he made no hostile moves, he never pointed a gun, he never threatened, what is that for our purposes? That is a fact. That is a fact finding. And they can argue that to a jury, that, hey, a reasonable officer in this officer's situation would have fired the shots. Because that is a question of fact, not a question of law. And I'm sure you've seen the video. So you know exactly what happened. But you also have to have the context of what were the officers on scene dealing with. The deposition, and this is in the appendix at page 213, Chief of Police Klein agreed. I asked him. When he shot himself, he did not want passerby to have the trauma of having witnessed that. Do you recall that? And Chief Klein, in his deposition, said, yes. He said he didn't want anyone to see. He was indicating he didn't want the officers to have the trauma of watching him blow a hole in his chest. And he didn't want the passersby to see this, because it would be traumatic. So this is the guy that's part of the equation here. Was he a threat to the passerby since he was armed? You would think yes is the answer. And common sense would say, well, under most circumstances, apparently so. But we counted. There were between 75 and 100 vehicles with multiple people passing by on the scene. He made no move ever to threaten any of those people. What was the district court's finding on that point? That he posed no threat to the officers or anyone else. Would the facts you've just described, as evidenced by the video, counter and be contrary to the district court's finding? No, it's consistent. I mean, you would think if a guy, I mean, here's the basics of my argument. When Ryan pulled the trigger, we had a man with a gun in his pocket, jogging slowly toward the town of Rifle. He was, at that moment, the trigger was pulled. He had a gun in his pocket. He was not threatening anyone at the moment that trigger was pulled. And that is the immediate issue. How do we factor in the refusal to heed the warnings? Right, I mean, that's all part of the calculus that goes into it. Could you be specific about that? What are we to do with that? Because that seems to me to be a troubling fact for your position. The failure to drop the gun goes to the officer's reasonable calculation as to whether or not this man poses an immediate threat. The Graham factors all say, the Larson sub-factors say, yep, that's relevant. And he did not drop the gun. But when the trigger was pulled, the gun was in his pocket, and he was slowly jogging away. He had already evinced concern over passers-by, that he didn't want to traumatize them by killing himself in their presence. So that's in the officer's calculus. He had made no move. Was it also in the officer's calculus that he did not want to be arrested and did not want to go back to jail? That would play into it as well. And he remained armed. He did. And I will also point you to the client deposition in the appellate record at page 217, where I'm asking the chief of police, you and your fellow officers have all agreed that it's generally considered to be hot air when somebody says something like that, correct? And he said, normally, yes. Now, there is evidence in the record to back up Chief Kline's comment that, yeah, to quote an old judge I used to appear before when I was a Brooklyn public defender in 1980, he said, after all is said and done, much, much more will be said than done. And Chief Kline agrees with that here by saying, yeah, everybody talks, but it's mostly hot air. And the actions- He remained armed, fled, refused to drop the weapon. That is correct. But he also showed through his actions. If this was suicide by cop, all he had to do is turn that gun toward the police, they would have killed him immediately. He did not. If he were interested in killing people in rifle, and here's where I was going with that, he was jogging toward rifle. The only justification at that moment for Officer Ryan to pull the trigger twice would be what Ryan himself testified to, and that is he was going into the town of rifle, that's a very populated area, and he could have hurt somebody in rifle. Okay? That is pure speculation on his part. Yes, everybody who is suicidal with a gun who wants to run away from the police has the potential for hurting someone anywhere. Counsel, what is your best case for clearly established law on your claim against Officer Ryan? Well, the best case, I think, is Cordova versus Aragon. That case seems involved, I mean, really different. It is. Really different. It's factually different, but this court lays out generalized principles of law. And in Cordova, it was a bad driving case. The guy stole a big rig and was driving the wrong way down a one-way street. This court then said, we ask only whether the potential risk to third parties created by Mr. Cordova's driving was alone sufficient to justify Officer Aragon shooting him. Counsel, it seems to me that what you're looking for is sort of some version in our circuit of Cole from the Eighth Circuit, which I think is also totally factually distinguishable because there were no warnings there. But that's sort of the principle of law that one would see distilled, right? It's that a person who doesn't pose an immediate threat, we have here, although in possession of a gun, he doesn't point it at anybody, doesn't use it in a menacing fashion, you can't use excessive force. Do we have anything like that? Or is your best case Cordova? Well, Cordova is a good case. Caballos versus Huss is a Tenth Circuit case. And again, it's a baseball bat in a driveway. Did the district court cite that one? I don't recall if the district court did cite that or not. We cited it in our brief. And again, the principle of law, even though it's a baseball bat case, not a gun case, the principle of law is what's important here. The mere possibility that Caballos may have presented a threat to the general public and he left his driveway does not weigh heavily on Officer Husk's side. That's the key. That's where we're going with all of this. We live in the world of probable, not in the world of possible. Everybody with a gun who's unstable carrying a concealed weapon is a possible threat to officers. But they have to have probable cause, not possible cause, to believe that he is actually going to use this gun to threaten an officer or threaten passersby or other people. That is the principle set forth in Cordova and in Caballos, which gives officers on the street guidance. You can't just shoot somebody because they could possibly go out and hurt someone. And your formulation of the clearly established doctrine, as applied in this case, requires us to walk into it with the fact of threat established. Is that right? Or the fact of there was no threat? Yeah, I mean, the district court found as a matter of fact he never threatened an officer with a gun, which is true. He never did. And he never threatened any passerby with a gun, which is also true. I mean, it's legal conclusions aside. I'm sure you've watched the video. As a district court said, she watched it multiple times. And you can see, I mean, when a guy is suicidal, yes, you can expect him to disregard police commands. I think his attitude must have been, and this is speculation, what are they going to do, kill me? I mean, he's got a gun to his chest anyway. And then for unknown reasons, we'll never know. He puts the gun in his pocket, which is a statement of, I'm not looking right at this moment to shoot anyone. It's in my pocket, and I'm slowly jogging away. And the Graham factor that requires what is in the officer's mind, is there an immediate threat? Not, was he threatening somebody five minutes ago? Or could he be threatening somebody five minutes into the future? Graham says the immediate threat. Well, it's at the moment, right? But we also have to look at that with the totality informing that, right? It is the totality that defines that. And when you see somebody expressing concern, as he did during the video, and you can see it in the video, he's worried about imposing trauma on passersby if they see him kill himself. He's worried about the trauma to the police, for goodness sake. How many people that are setting out to shoot it out with the police, or kill innocent civilians, or expressing concern for their mental health before he does this? Counsel, you have very little time left, and I have a couple questions for you. Sure. Could you switch to talking about Chief Klein, the claim against Chief Klein, and sort of explain how the district court's analysis of this seems not fully developed to me. And so I'm trying to understand how we adopt your position in light of the district court's conclusions here. I can do that pretty quickly, Your Honor. In the record at 201, Beitzel, his partner, says this shoot was by the book. This was a good shoot. It was done pursuant to custom practice and policy. Klein, Chief Klein at page 213 of the appellate record, I asked him point blank, so you would agree that everything that occurred between Dewey Ryan and Alan George was pursuant to rifle, custom practice, and policy? Answer, yes. That's on page 231 of the appellate record. Page 215 of the appellate record, this use of force complied with policy and Colorado law. Mike Kuiper, Cooper, I'm not sure how to pronounce his name, he's their 30B6 witness, at page 222 of the appellate record, said, and you concluded that Corporal Ryan's shooting of Mr. George was consistent with the rifle police department policy on the use of force, correct? Answer, correct. And all of this was before the district court? Yes. And appellate record at 224. All right. A little bit earlier, you testified that when you were reviewing the actions of Alan George in this case, you felt that Corporal, or I guess when you were reviewing Corporal Ryan's actions, you felt that his use of deadly force was consistent with rifle policy, correct? Answer, correct. That's their 30B6 witness. That's how Chief Klein remains in this case. You can't have it any clearer. Chief himself said, this was done pursuant to custom practice and policy. But the suit is an individual, isn't he? He is. And we don't have respondeats, period. Correct. But we have a failure to train and supervise. And this court, in a pretty recent case, Valdez. Well, just because they said he followed their policy, that doesn't mean that it was a bad policy unless you show it was. Right. In what respect was the policy bad? Well, it's a failure to train properly. If this was done pursuant to their policy and consistent with their training, then their training that Chief Klein is in charge of is insufficient. Well, so if he says if somebody has a gun out, they're wanted for a felony, and if they run, you can shoot at them, that's not right. That is not right under Garner v. Tennessee. And that's your strongest, clearly established law case, is Tennessee v. Garner and Caballos? And what else? What else you got? Cordova v. Aragon and the out-of-district cases, which are much more factually analogous. But as I have previously said, it is the principles of law set forth in Cordova and Caballos that mere possibility and speculation is not enough. And that's exactly what happened here. The immediacy of the threat was not there. He was running away with a gun in his pocket. And counsel is right. Maybe they could have shot him when he pulled the gun initially and was walking toward them. They did not. But that's not the issue before this court. Thank you, counsel. Thank you very much. We can add three minutes, if you'd like to take it, to even things out. Thank you, Your Honor. I would like to address the claims against Chief Kline, because I think that's important here. And I think perhaps the biggest issue with the district court's ruling is the decision related to Chief Kline. As Judge Kelly points out, there is no respondee at Superior. And in order to prove a supervisory liability claim, you have to have personal involvement, you have to have causation, and you have to have state of mind, which is deliberate indifference to a lack of training or whatever it may be. Their theory here is that Chief Kline testified, this was done by the book. Well, so let's look at the book. And we presented the book to the district court. We presented the use of force policy. We presented the training. We provided sworn testimony from Chief Kline as to what the training is. And the training isn't that you can shoot someone in the back when they're fleeing if they've got a felony warrant. The training that is in the record is consistent with the Fourth Amendment. It's consistent with Tennessee v. Garner. It's consistent with Graham v. Garner. And it's consistent with state law. So there is no deliberate indifference. There is no recognition or any evidence in the record that Chief Kline at any point was aware that there was training as suggested by Mr. Lane, and he sat back and did absolutely nothing about it. No personal involvement. He's at home when the shooting takes place. There's no evidence that he in any way directed the conduct of Sergeant Bryan. And again, I think I've just addressed the causation issue in terms of the training that was provided. So absent any other questions, thank you for the additional time. Any questions? Thank you, counsel. Thank you. Thank you, counsel, for your helpful arguments. The case is submitted.